**John DOE, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 98–896C.**

United States Court of Federal Claims.

Nov. 14, 2002.

Robert A. Van Kirk, Williams & Connolly LLP, Washington, DC, for plaintiffs. Brendan V. Sullivan, Jr., J. Alan Galbraith, David S. Blatt, R. Hackney Wiegmann, Russell D. Covey, and Matthew S. Amatruda, of counsel.

Hillary A. Stern, United States Department of Justice, Washington, DC, for defendant with whom were Robert D. McCallum, Jr., Assistant Attorney General; Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Robert Hollis, Assistant Director; Kathryn A. Bleeker, Assistant Director; and Lawrence N. Minch.

## OPINION AND ORDER

HODGES, Judge.

This is a class action against the United States on behalf of current and former Department of Justice attorneys who seek overtime pay under the Federal Employees Pay Act, 5 U.S.C. §§ 5542, 5543, and 5545(c)(2)

(FEPA).[1] The parties filed cross-motions for summary judgment on the issue of liability. Sections 5542 and 5543 provide that government employees are entitled to premium pay or compensatory time for overtime work that is ordered or approved by authorized persons, with certain exceptions. Section 5545(c)(2) provides premium pay for administratively uncontrollable overtime.[2]

The crucial phrase "ordered or approved," as currently construed by the courts, encompasses the members of this Class in the circumstances presented. Attorneys are expected to work overtime and they do so on a regular basis. They are induced to work overtime by direct supervisors, if not authorized officials as defendant would define them. The overtime that they work is well known at the highest levels of the Justice Department. The Department recognizes that it could not function properly within its budget constraints without officially induced and approved overtime work by government attorneys.

The Department of Justice has "ordered or approved" overtime for members of the Class, for purposes of the Federal Employees Pay Act. Class members are entitled to overtime pay if they can meet the standards of proof required by law.

## I. BACKGROUND

This class action lawsuit involves more than 10,000 attorneys from Department of Justice divisions across the nation.[3] Plain-

1. Additional information may be found in earlier published opinions at Doe v. United States, 46 Fed.Cl. 399 (2000); and Doe v. United States, 47 Fed.Cl. 594 (2000).

2. Section 5545(c)(2) states:
The head of an agency, with the approval of the Office of Personnel Management, may provide that—
an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for regularly scheduled over-

time, night, and Sunday duty, and for holiday duty.
We held that this section does not apply to the Class because "[t]he discretion to determine whether an employee will be provided premium pay under this section rests with the head of the Agency, with the approval of the Office of Personnel Management. Both agencies must exercise discretion in deciding whether an employee is entitled to AUO pay pursuant to this statute." Doe v. United States, 46 Fed.Cl. 399, 401 (2000).

. . . . .

"The Attorney General issued DOJ Order 1551.4A" in response to this authority, but did not include "Attorney" on the list. Id.

3. An August 27, 1999 Order stated, "the issues in this case must be litigated as a class action in the interest of justice. Certification is appropriate

tiffs are trial attorneys who litigate cases on behalf of the United States. Their caseloads are demanding and often require overtime to complete tasks or to meet deadlines. They are not heavily supervised, in that the conduct of their cases generally is left to their professional judgment. Plaintiffs do not allege that they were explicitly ordered to work overtime by an authorized official, but that management's expectations and their caseloads require work in excess of forty hours a week to complete satisfactorily. *See Anderson v. United States*, 136 Ct.Cl. 365, 393, 1956 WL 8341 (1956) (" tone and content of instructions were so cast as to imply (if not overtly to state)" that employees could not acceptably perform their work within forty hours per week.).

Defendant argues that the purpose of the Federal Employees Pay Act is to compensate employees for official extensions of their workday or workweek. The Act is not intended to compensate employees for all hours of job-related activity in which they decide to engage. Plaintiffs are not entitled to premium pay for extra hours unless an authorized official establishes a workday in excess of eight hours or a workweek in excess of forty hours. In this case, no authorized official assigned extra duty hours to

any members of the Class. No authorized official directed plaintiffs to perform duties during the period before or after their eight-hour day or forty-hour week. No authorized official expressly approved the performance of extra hours of work by plaintiffs.

Plaintiffs counter that overtime is necessary because of the demanding nature of their responsibilities. They maintain that work cannot be done to professional standards without overtime. They are entitled to premium pay when they devote extra hours to work-related activities.

Members of this Class are covered by premium pay provisions of the Federal Employees Pay Act unless they are paid at the level of GS–15, step 10 or higher. 5 U.S.C. § 5547.[4] Employees at level GS–10 and below are entitled to pay for ordered or approved overtime unless they request compensatory time in lieu.[5] Attorneys above GS–10 are not necessarily entitled to overtime pay even if it is ordered or approved, but may be given compensatory time instead at the Agency's discretion.[6]

In summary, the Agency must pay overtime to an employee at level GS–10 and below unless the employee requests compensatory time in lieu. An employee above GS–10 is not necessarily entitled to overtime pay

due to the large number of class members, the predominance of common questions of law and fact relating to DOJ's policy and practice concerning overtime for attorneys, and the adequacy of the current plaintiffs and their attorneys to represent the class." *Doe v. United States*, No. 98–896C (Fed.Cl. August 27, 1999).

**4.** 5 U.S.C. § 5547 Limitation on premium pay

(a) An employee may be paid premium pay ... only to the extent that the payment does not cause the aggregate of basic pay and such premium pay for any pay period for such employee to exceed ...—

(1) the maximum rate of basic pay payable for GS–15 ....

**5.** 5 U.S.C. § 5542 Overtime rates; computation

(a) For full-time, part-time and intermittent tours of duty, hours of work officially ordered or approved in excess of 40 hours in an administrative workweek, or ... in excess of 8 hours in a day, performed by an employee are overtime work and shall be paid for ... at the following rates:

(1) For an employee whose basic pay is at a rate which does not exceed the minimum rate of

basic pay for GS–10 ... the overtime hourly rate of pay is an amount equal to one and one-half times the hourly rate of basic pay of the employee, and all that amount is premium pay.

(2) For an employee whose basic pay is at a rate which exceeds the minimum rate of basic pay for GS–10 ... the overtime hourly rate of pay is an amount equal to one and one-half times the hourly rate of the minimum rate of basic pay for GS–10 ... and all that amount is premium pay.

**6.** 5 U.S.C. § 5543 Compensatory time off

(a) The head of an agency may—

(1) on request of an employee, grant the employee compensatory time off from his scheduled tour of duty instead of payment under section 5542 ... for an equal amount of time spent in irregular or occasional overtime work; and

(2) provide that an employee whose rate of basic pay is in excess of the maximum rate of basic pay for GS–10 ... shall be granted compensatory time off from his scheduled tour of duty equal to the amount of time spent in irregular or occasional overtime work instead of being paid for that work under section 5542 of this title.

even if it is ordered or approved, but may be given compensatory time instead at the Agency's discretion. Employees above level GS–15 are not entitled to premium pay or compensatory time.

The Federal Employees Pay Act states that employees will be paid overtime "for full-time, and part-time and intermittent tours of duty, hours of work officially ordered or approved in excess of forty hours in an administrative workweek, or ... in excess of eight hours in a day ...." 5 U.S.C. § 5542(a). The key to this case is the meaning of the phrase "ordered or approved" as used above and as applied to the Class.

## II. ARGUMENTS

### A. Plaintiffs

The parties agree that the facts necessary to this opinion are not in dispute, and that the case is appropriate for summary disposition on liability. While the facts are not complex, their application to the meaning of "ordered or approved" as used in the Federal Employees Pay Act is. No case has addressed circumstances in which litigating attorneys for the Government seek overtime. Case law on the meaning of FEPA and similar laws that provide premium pay for government employees often involve law enforcement officers whose schedules are both unpredictable and uncontrollable. Those cases are not closely on point, but some are instructive.[7] They suggest a trend from early strict interpretations of the statute, toward a more equitable approach in recent years. *See, e.g., Anderson v. United States*, 201 Ct.Cl. 660, 666, 1973 WL 21343 (1973) ("Equity here requires that the natural consequences should be drawn from defendant's failure to schedule the overtime ...."); *Manning v. United States*, 10 Cl.Ct. 651, 663 (1986) (law will treat as issued those orders that ought to have been issued).

Plaintiffs urge the court to consider issues relating to the historic application of the phrase "ordered or approved" in light of several important facts. These are the deposition testimony of former Assistant Attorney

General Stephen R. Colgate, who agreed that division heads at the Department of Justice "expect" attorneys to work overtime; the fact that the Department of Justice keeps track of actual hours that its attorneys work, including overtime hours, for administrative purposes and to assess attorneys' fees; that full knowledge and approval of overtime worked has been imputed to management through a task force known as the Working Group; and that the Justice Department's employment manual for attorneys provides them blanket direction to work overtime as necessary.

Assistant Attorney General Colgate testified that he did expect that attorneys would work overtime, and that he approved of that policy. He stated that any employee who thought that he or she was working overtime with DOJ approval would have been reasonable in making such an assumption. Plaintiffs believe that the effect of Mr. Colgate's testimony is that DOJ has issued a standing order ("expectation") through its authorized official, for attorneys to work overtime.

Some offices in the Department of Justice that are represented in the Class are required to keep detailed overtime records for each attorney, in addition to regular time cards showing forty-hour workweeks. These offices account for approximately eighty-five percent of the attorneys in the Class. Plaintiffs have referred to these records as a "second set of books" or "double bookkeeping." They establish both authority and approval, according to plaintiffs, and they prove how much time attorneys actually worked. The overtime records are used for budgetary purposes and to assess attorneys' fees against opposing parties when statutes permit.

Plaintiffs believe that the United States Attorneys Manual confirms a Class-wide policy of requiring (ordering or approving) overtime by officially authorized individuals. The Manual is evidence of a systemic policy that permeates the Department of Justice, they argue, and a statement in the Manual that purports to advise employees that they will

---

7. Defendant argues that these cases should be limited to those involved in law enforcement.

The cases do not suggest that such a limitation is appropriate, however.

not be paid overtime is an effort to subvert requirements of the pay statutes.

The Working Group was assembled by Assistant Attorney General Colgate in 1994 to address the problem that plaintiffs bring before the court now. Officials at the Justice Department knew that attorneys were working overtime, and they needed the overtime to complete DOJ's mission within budgetary constraints. They did not want the Government to pay the costs associated with overtime work, according to plaintiffs. The Group's report was circulated at the highest levels of the Justice Department, and presented to the Attorney General. The Report recommended that the Department seek legislation from Congress exempting attorneys from eligibility for overtime.

### B. Defendant

Defendant emphasizes the traditional requirement in this court that only government officials acting with authority may bind or obligate the United States, in this case only by direct order or approval. No member of the Class has ever requested overtime as required by the statute, defendant notes. Plaintiffs must show a directive to work overtime for a specific period. Cases allowing overtime pay find such specific directives, or perhaps coercion.

Defendant asserts that former Assistant Attorney General Colgate's testimony concerning his "expectation" that attorneys will do what is necessary to get the job done is not an order to work overtime. It cannot serve as a "standing order" for attorneys to work overtime or a "blanket approval" of such overtime. When plaintiffs performed extra hours of work, it was generally because of their dedication and professionalism. They made independent judgments based on applicable external deadlines, the time that they anticipated their tasks would take, and the importance of other tasks to be accomplished during the same time.

"Plaintiffs have never requested overtime pay for any extra hours that they spend,"

defendant notes. Cases finding liability for overtime usually include policy directives such as "it is expected that *you will perform* without extra compensation . . . ." *See, e.g., Byrnes v. United States,* 163 Ct.Cl. 167, 171, 330 F.2d 986 (1963) (emphasis added). This directive should be compared with the DOJ Attorneys' Manual, which states that attorneys *"should expect* to work in excess of regular hours without overtime premium pay." (emphasis added).

According to the Manual, "Assistant United States Attorneys are professionals and should expect to work in excess of regular hours without overtime premium pay." [8] The statement that an attorney is likely to work excess or extra hours is not an order to work overtime. For an expectation to be an order or authorization, it must be a requirement—not mere anticipation. It must be explicit in its terms. Stating that attorneys are expected to complete their work is not an order either. All employers expect their employees to complete their work.

Assistant Attorney General Colgate testified, "I guess my view was that attorneys were there to perform the assignments that they were given. I don't know if I would use the term that they were 'induced' to [work] overtime. It was more a notion of a professional who was to . . . perform the necessary efforts to ensure an adequate effort on the assignment given to him."

Defendant disputes the notion that its case management records are a "second set of books." The Department has accounting systems for different purposes. The records track efforts of attorneys irrespective of whether their work was ordered or approved. They are not used for compensation. Authorized officials do not see individual records, but only a compilation. The compilation is presented in summary reports for statistical purposes. At most, the records inform management that plaintiffs were working extra hours.

---

**8.** By its terms, the Manual seems to apply only to United States Attorneys and their offices, and possibly to attorneys in other offices who prosecute cases enforcing the laws of the United States. This was not an important argument in the briefs or during a number hearings on this case, however. The Manual is evidence of a climate or culture within the Department of Justice that legally does not depend on the specific department to which it is addressed.

The Government discounts the significance of the Working Group as evidence of management approval of overtime. The purpose of the Working Group was to determine how various departments were addressing extra hours worked by attorneys and to review the possibility that some offices were compensating attorneys for extra hours and that others were not. The goal was to create a uniform policy for the entire department. The Group did not consider why attorneys were working extra hours and could not therefore have provided evidence that such overtime was expected or required from high-level officials at the Department of Justice.

### C. "Ordered or Approved"

The crucial issue remains, what does "ordered or approved" mean in this context. Defendant argues that only a direct command, regulation, or other official action by an authorized person can qualify an employee for overtime pay. According to plaintiffs, the phrase "ordered or approved" means only that the overtime ultimately must be attributable to an authorized person, directly or by implication.

### 1.

Plaintiffs argue that case law has found "order or approval" from official encouragement, expectation, or inducement, before or after the fact, in writing or orally, by authorized officials or by individuals acting in accordance with their wishes. An express or formal order is not required. This court has stated that "[o]vertime work performed with the knowledge and inducement of supervisory personnel is deemed to be 'officially ordered or approved.'" *Manning v. United States,* 10 Cl.Ct. 651, 663 (1986). *See Adams v. United States,* 162 Ct.Cl. 766, 1963 WL 8610 (1963), for a discussion of the importance of considering the nature of an employee's job to determine the degree of formality of approval required.

The Government maintains that claims for overtime must be "actually authorized or approved by an appropriate government official," citing *Gaines v. United States,* 158 Ct.Cl. 497, 500, 1962 WL 9303 (1962) *cert. denied,* 371 U.S. 936, 83 S.Ct. 309, 9 L.Ed.2d 271 (1962). Case law has evolved since the *Gaines* decision in 1962, however. *See, e.g.,*

*Hannon v. United States,* 29 Fed.Cl. 142, 149 (1993); *Manning v. United States,* 10 Cl.Ct. 651, 663 (1986) ("The law will treat as issued those orders that ought to have been issued."); *Anderson v. United States,* 201 Ct. Cl. 660, 666, 1973 WL 21343 (1973); *Byrnes v. United States,* 163 Ct.Cl. 167, 330 F.2d 986 (1963).

### 2.

The Federal Employees Pay Act clearly requires an explicit order of overtime for employees to receive overtime pay, according to defendant. One need only compare its requirements with the more well-known Fair Labor Standards Act. 29 U.S.C. §§ 201–219. The Fair Labor Standards Act limits the *employ* of a worker for longer than forty hours per week without overtime pay. 29 U.S.C. § 207(a)(1). "Employ" as defined in the statute, "includes to suffer or permit to work." 29 U.S.C. § 203(g). Thus, an employee need not demonstrate that he was directed or ordered to work overtime, but only that his supervisor was aware that he worked extra hours and did not stop him from doing so. *See, e.g., Forrester v. Roth's IGA Foodliner Inc.,* 646 F.2d 413, 414 (9th Cir.1981).

This is the standard used in the private sector and by some government agencies. Congress did not use the "suffered or permitted" language in the Federal Employees Pay Act, and defendant argues that the language of FEPA was an attempt by Congress to establish more strict standards for employees of the type in this Class.

No plaintiff in the Class has requested overtime, and it follows that no authorized official could have ordered or approved it. If an expectation exists within the Department of Justice that its employees will work a certain number of overtime hours for free, this is a management problem that must be addressed as such, not as a class action lawsuit under the pay statutes.

Defendant contends that work not officially ordered or approved would not be compensable under FEPA even if it were "suffered and permitted." Only "hours of work officially ordered or approved" are compensable under FEPA. Defendant's argument on this

point is persuasive, and early cases support such a reading. Mere knowledge of extra hours worked was not sufficient to constitute order or approval pursuant to FEPA. *See, e.g., Tabbutt v. United States,* 121 Ct.Cl. 495, 1952 WL 5985 (1952); *Gray v. United States,* 136 Ct.Cl. 312, 1956 WL 8337 (1956); *Bilello v. United States,* 174 Ct.Cl. 1253, 1966 WL 8860 (1966). Recent cases suggest that a more liberal or equitable standard is appropriate, however.

## III. DEVELOPMENT OF THE CASE LAW

A discussion of the law begins with this observation from the dissenting opinion in *Anderson v. United States,* 201 Ct.Cl. 660, 1973 WL 21343 (1973): "In the court's decisions in *Albright, Baylor, Bates* (citations omitted); and this case, the court has taken almost every conceivable position with regard to overtime. Consequently, an employee seeking overtime can likely find an opinion of this court that fits his situation regardless of what it may be." *Anderson v. United States,* 201 Ct.Cl. 660, 675, 1973 WL 21343 (1973) (Skelton, J., dissenting). This highlights the difficulty of applying the correct FEPA standard to government employees; its application to litigating attorneys who represent the United States is problematical.

Defendant's argument that plaintiffs must establish specific directions from authorized officials to work overtime is normal procedure in other areas of litigation involving claims against the United States. Most causes of action against the Sovereign require clear direction from an authorized official. For example, this court routinely hears government contract cases in which the dispositive issue is whether an authorized official issued the order or direction upon which a contractor relied. A mere expectation normally would not be equated with an order or direction in a contract case.

A written directive or order to perform overtime work would satisfy the statutory requirement of FEPA under any interpretation. The question in this case is whether less than explicit orders or approvals suffice. For example, plaintiffs argue that the existence of a "culture" within an agency in which employees spend all the time necessary to get the work done; a "climate" in which long hours are expected either because of the employee's business or profession or because of the nature of work; an "expectation" from top management that employees will work overtime to complete their jobs properly; or an "assumption" that such work will be necessary, may establish "order or approval" for purposes of the statute.

Until *Anderson v. United States,* 136 Ct.Cl. 365, 1956 WL 8341 (1956), defendant's position that the law should be strictly construed in this area appeared to be correct. Beginning with *Anderson,* however, the courts began to use more equitable considerations to decide overtime pay claims against the Government. The phrase "ordered or approved" as used in the pay statutes became subject to broader interpretations, including inducement, encouragement, and perhaps expectation.

### A. Strict Interpretation Pre-*Anderson*

The court in *Post v. United States,* 121 Ct.Cl. 94, 1951 WL 5358 (1951) noted with displeasure that plaintiff's argument for overtime was based on the fact that his work required it, and "it must have been contemplated that overtime would be necessary." *Post,* 121 Ct.Cl. at 99. Plaintiff failed to prove that he actually performed the overtime, however, and the court commented, "[t]he case as a whole shows the wisdom of the requirement ... that compensation shall be paid for overtime officially ordered and approved." *Id.*

Plaintiffs in *Tabbutt v. United States,* 121 Ct.Cl. 495, 1952 WL 5985 (1952), *Goldstein v. United States,* 121 Ct.Cl. 495, 1952 WL 5985 (1952), and *Matlack v. United States,* 121 Ct.Cl. 495, 1952 WL 5985 (1952), could not establish that the overtime they worked was authorized or approved by a person with authority. These cases were decided together and overtime compensation was denied in all three. The plaintiff in *Farley v. United States,* 131 Ct.Cl. 776, 127 F.Supp. 562 (1955), lost his bid for overtime because it was not ordered or approved, even though a regulation required that he "remain on duty."

### B.  A Move Toward Equity—*Anderson v. United States*

The court awarded overtime pay to Customs Inspectors in *Anderson v. United States*, 136 Ct.Cl. 365, 1956 WL 8341 (1956). Congress had added overtime coverage for the inspectors and the Commissioner of Customs did not approve of the new policy. The court found that the Commissioner had never made the forty-hour workweek "a reality" and that he suggested "voluntary overtime" to district superintendents and their subordinate supervisory officials. *Anderson*, 136 Ct.Cl. at 370. Moreover, he knew that Customs employees were working "voluntary overtime." *Id.* The Commissioner had authority to order or approve overtime, and "[while] he did not order the work to be performed, he certainly knew and approved of its being done." *Id.*

A Customs regulation provided that written authorization was necessary for employees to qualify for overtime, and no such authority had been granted, but the court held that such a requirement was not in the statute and declined to enforce it. *Id.* at 370. The withholding of written orders "reflected observance of the letter of the regulation but denial of the substance of the statute." *Id.* at 371.

The authorized official in *Anderson* advised employees that overtime would not be compensated, as the Manual does here. *Id.* at 385. Also, employees submitted time records showing that they worked no more than eight hours per day. A second set of records showing the number of hours actually worked was used for efficiency ratings and to make recommendations for promotion. *Id.* at 392. The court adopted the following finding of fact:

> The fair conclusion from the record as a whole is that the plaintiffs were induced to perform the overtime by the district superintendents and their subordinate officers, and that in providing such inducement the district superintendents acted under the leadership and upon the specific suggestion of the Commissioner of Customs.

*Anderson*, 136 Ct.Cl. at 394.

*Gray v. United States*, 136 Ct.Cl. 312, 1956 WL 8337 (1956) was decided on the same day

as *Anderson*, by the same panel. The court denied overtime pay to a narcotics agent because it "was neither officially approved orally nor in writing" and the evidence did not establish "that plaintiff was induced or directed by his supervisors directly or indirectly by writing or otherwise to work overtime." *Gray*, 136 Ct.Cl. at 313. According to the dissenting opinion, "the Commissioner . . . knew that narcotics agents worked, on the average, 13 hours a week more than the 40 hours named in the [pay statute]," and the case could not be distinguished from *Anderson v. United States*, 136 Ct.Cl. 365 (1956). *Gray*, 136 Ct.Cl. at 313 (Madden, J., dissenting).

*Aviles v. United States*, 151 Ct.Cl. 1, 1960 WL 8530 (1960). Meat inspectors routinely worked overtime in processing plants because of the nature of the job. Regulations required that they be on premises during all meat processing operations. The issue involves distinctions between regularly scheduled overtime and irregular overtime that do not apply here. However, the court discussed the case in terms of fairness and equity, and held that plaintiffs must be paid at the premium levels that they requested.

In *Albright v. United States*, 161 Ct.Cl. 356, 1963 WL 8497 (1963) civilian security guards employed by the Norfolk Naval Shipyard were required to report fifteen minutes before their tour of duty began, but there was a "tacit expectation" that they should be there at least twenty minutes early. *Albright*, 161 Ct.Cl. at 357, 359. A regulation required that employees should "report to police headquarters fifteen minutes before going on duty." The court found that the fifteen minute requirement must be compensated as overtime because it was a part of the regulation, but that the practice of arriving an extra five minutes early was only "tacit" and not therefore ordered or approved.

> Tacit expectation is not equivalent to the statutory requirement of official order or approval. The plaintiffs not only have the burden of proving that they were ordered to appear 20 minutes before the shift start-

ed, [but] also that the order was issued by one having the authority to do so.

*Id.* at 361.

*Adams v. United States,* 162 Ct.Cl. 766, 1963 WL 8610 (1963) applied the principles of *Anderson.* Border Patrol Inspectors were denied overtime because the Commissioner of Immigration and Naturalization had withheld written orders, which should have been issued in the circumstances. The authorized official ordered or approved the work, but would not put it in writing. Some of the assignments were "of an emergency nature" and advance approval in writing was not practical. "With respect to ... work of this type, it was unreasonable for the Department of Justice to centralize in two high departmental ... officials" the authority to approve overtime. *Adams,* 162 Ct.Cl. at 770.[9] The court looked to the nature of employees' jobs to determine the degree of formality of the approval required, and found an "implicit authorization" in the Commissioner of Immigration and Naturalization. *Id.* The court ignored requirements for approval that it found to be unrealistic.

Sixty-five investigators for the Alcohol and Tobacco Tax Division sought overtime compensation under the Federal Employees Pay Act in *Byrnes v. United States,* 163 Ct.Cl. 167, 330 F.2d 986 (1963). The issue was whether work done beyond the eight-hour day was officially ordered or approved within the meaning of FEPA and Internal Revenue Service regulations. The IRS regulation regarding entitlement to overtime pay required that the overtime "be ordered or approved ... in writing by an officer or employee to whom ... authority has been specifically delegated by the head of the department." *Id.* at 171.

The investigators in *Byrnes* had not qualified for premium pay until a 1954 amendment to FEPA authorized it for them. Federal Employees Pay Act Amendments of 1954 (68 Stat. 1109, 5 U.S.C. § 911 (1958)). Internal Revenue Service granted coverage under the new law for employees in all of its regions, then arbitrarily withdrew authority for premium pay in two of them. (The court later described this arbitrary decision on the part of IRS as a reason for its ruling in favor of the *Byrnes* employees. *Rapp v. United States,* 167 Ct.Cl. 852, 868, 340 F.2d 635 (1964)).

Officials told employees in *Byrnes* that they were expected to "perform without extra compensation any overtime that may be necessary to make good cases and achieve effective results ...." *Byrnes,* 163 Ct.Cl. at 171, 330 F.2d 986. The expectation that employees would work overtime was not tacit, but "was made so explicit in terms as to amount to inducement and compulsion." *Id.* at 174.

*Byrnes* finds approval in the acquiescence of authorized officials, and perhaps even in the lack of *disapproval.* The court ruled that "plaintiffs' overtime work was performed with the full knowledge, encouragement and inducement of [IRS] officials, as well as the officials in the National Office." *Byrnes,* 163 Ct.Cl. at 174. Furthermore,

[t]he Regional and National Offices ... regularly received periodic reports of the overtime work by all investigators in the regions during the period involved in this litigation, and either *approved or acquiesced therein.* These reports were prepared on the basis of regular daily reports by the investigators, including all hours of overtime and an explanation thereof to their supervisors who were primarily responsible for appraisal of essential over-

---

**9.** After this case was filed, a United States Attorney sent a memo to her employees stating that the office "anticipate[s] business as usual" but included the following directive from the Executive Office for United States Attorneys:

To control holiday premium pay, managers should consider issuing memoranda reminding employees that an upcoming holiday is supposed to be a day off with pay and that employees are not expected to report for work unless specifically ordered to do so. An em-

ployee who persists and still works on the holiday would get the holiday pay, but could also get a disciplinary action for failure to follow instructions.

She noted that "[a]pproval for holiday work shall be required in advance and may be approved by Lanny, Emily, Jim, and after June 1, Robin ...." The authority for approval of holiday pay in this instance apparently was not at the level of Assistant Attorney General or a Division Head.

time .... There is no evidence of any *official disapproval* of these overtime reports during the period involved in this case.

*Byrnes,* 163 Ct.Cl. at 174–75 (emphasis added).

*Rapp v. United States,* 167 Ct.Cl. 852, 340 F.2d 635 (1964) involved officers of the Federal Civil Defense Administration who had duty officer responsibilities in addition to their forty-hour workweek. Documents related to the duty officer system were couched in mandatory terms. The national office was candid in advising employees that overtime pay was not authorized for these tours. "This candor, however, does not relieve the Government of its responsibility under the statute to pay overtime or premium pay for authorized extra work." *Rapp,* 167 Ct.Cl. at 864 (quoting *Byrnes v. United States,* 163 Ct.Cl. 167, 174, 330 F.2d 986 (1963)).

Plaintiffs were not only 'induced' to perform duty officer tours but were given reasonable and understandable grounds for fearing that they might jeopardize their positions if they did not do so. In other words, plaintiffs worked under circumstances that amounted to duress and coercion. Work performed under such circumstances is no more 'voluntary' than a statement or confession in a criminal case which is extracted by threats or promises on the part of a law enforcement or prosecuting officer.

*Rapp,* 167 Ct.Cl. at 863. *See also Byrnes v. United States,* 163 Ct.Cl. 167, 174, 330 F.2d 986 (1963).

The court in *Bilello v. United States,* 174 Ct.Cl. 1253, 1966 WL 8860 (1966) denied plaintiffs' claim for overtime pay because a requirement to arrive thirty minutes early was ordered and enforced by supervisory personnel lacking authority under the regulation. This case was the impetus for a strong dissenting opinion in *Anderson v. United States,* 201 Ct.Cl. 660, 667, 1973 WL 21343 (1973) (Skelton, J. dissenting).

Plaintiffs quote *Bates v. United States,* 196 Ct.Cl. 362, 450 F.2d 886 (1971) for the proposition that a "memorandum stating that employees should arrive 'sufficiently in advance of the scheduled duty hours to commence work at the scheduled time' constituted necessary authorization for overtime." *Id.* at 367. This decision was anomalous, however, because its outcome depended on a stipulation that the approving official was authorized, mistakenly submitted by defendant. "There is no proof in this record that the head of the department or any staff office head, or their designees, ever ordered or approved the alleged overtime." *Bates,* 196 Ct.Cl. at 373 (Skelton, J., dissenting).

Plaintiffs in *Anderson v. United States,* 201 Ct.Cl. 660, 1973 WL 21343 (1973) were nursing assistants at a Veterans Administration Hospital. They were required to arrive early and stay late each day to change in and out of government-issued uniforms. The *Anderson* court cited *Aviles v. United States,* 151 Ct.Cl. 1, 1960 WL 8530 (1960), which it described as an equitable decision, treating that as done which ought to have been done. "Equity here requires that the natural consequence should be drawn from defendant's failure to schedule the overtime as its own regulation required ...." *Anderson,* 201 Ct. Cl. at 666. The court determined that authorized officials "should have been (and it is reasonable to infer from the record as a whole that both were) aware of the [early reporting]." *Id.* at 685 n. 9, 1973 WL 21343.

A civilian employee working for the Navy recorded his overtime on time cards and turned them in to the proper authority in *Manning v. United States,* 10 Cl.Ct. 651 (1986). He received overtime until supervisors began to worry about the cost and stopped paying him. "Overtime work performed with the knowledge and inducement of supervisory personnel is deemed to be 'officially ordered or approved.' The law will treat as issued those orders that ought to have been issued." *Manning,* 10 Cl.Ct. at 663.

Plaintiffs in *DeCosta v. United States,* 22 Cl.Ct. 165 (1990) were firefighters who argued that they should have received a rate of premium pay higher than their standby pay under the Federal Employees Pay Act. This case addresses a different section of the Federal Employees Pay Act, but it discusses the importance of the nature of employees' jobs

in determining the degree of formality of approval required.

*Hannon v. United States,* 29 Fed.Cl. 142 (1993) involves investigators employed by the Drug Enforcement Administration. Although much of the opinion deals with jurisdiction, it discusses the evolution of decisions under FEPA and the courts' approach toward more equitable standards for finding that overtime has been ordered or approved. The opinion cites the equitable language from *Manning,* 10 Cl.Ct. at 663, discussed above, and finds that "authorization need not necessarily be express." *Hannon,* 29 Fed. Cl. at 149.

## IV. DISCUSSION

Stephen R. Colgate was Assistant Attorney General for Administration, in charge of Department of Justice personnel. Mr. Colgate was not aware that he had the authority to approve overtime, and in fact, he thought that it was Justice Department policy not to compensate attorneys for overtime. His understanding of the "culture" of the Department was that attorneys were expected to work overtime when necessary to complete their tasks. He thought it unlikely that attorneys could accomplish their tasks within forty-hour workweeks. Mr. Colgate knew that attorneys were asked to maintain records of hours in excess of eight hours a day and forty hours per week; his department purchased the software that many offices used to keep track of actual hours that they worked. He confirmed that the Department knew that its attorneys were working overtime, that it expected them to work overtime, and that it approved of their working overtime. As a matter of policy, however, the Department did not to pay its attorneys for the overtime that they worked.

Mr. Colgate's deposition essentially confirms that high-level officials at the Department of Justice who had the authority to order or approve overtime knew that its attorneys were working overtime. The general view of the culture within the Department of Justice was that attorneys were expected to do what was necessary to represent the interests of the United States properly. This included working additional hours beyond the forty-hour workweek.

Not having had knowledge of his own authority to approve overtime, Mr. Colgate did not know that he had delegated such authority to Ms. Schiffer for attorneys in the Environmental Division of the Justice Department, or to Ms. DiBattiste for United States Attorneys' offices. The same was true in the case of the Assistant Attorney General in charge of the Civil Division and the Assistant Attorney General in charge of the Civil Rights Division, whose authority for those components also had been delegated from Mr. Colgate.

The parties agree that former Assistant Attorney General Colgate was the only person who had authority to order or approve overtime for the entire Class. He acknowledged that he knew of no Division within the Department of Justice in which management had found it possible for attorneys to complete their work within a forty-hour workweek.

Deputy Assistant Attorney General John C. Vail was in charge of the Justice Management Division. He had been unaware of the Justice Department Attorneys' Manual but viewed it as being inconsistent with Title 5. Plaintiffs' counsel has represented that Mr. Vail considered the Manual's requirements to be "tantamount" to an order to work overtime. Mr. Vail could not identify a difference between an expectation that attorneys work overtime and an express order to work overtime, according to plaintiffs.

The Attorney General and the Deputy Attorney General asked Mr. Colgate to set up the "Working Group" described in the parties' arguments, above. Mr. Colgate directed Mr. Vail to organize the Group in 1994. Mr. Vail brought together representatives from all components of the Department of Justice, and they met for a period of several months to discuss complaints that the Attorney General had heard from attorneys at town meetings concerning hours and working conditions.

The Working Group concluded that attorneys were working many additional hours that were not being compensated, and that

these additional hours not only were expected by management, but also they were used as a basis for evaluations, promotions, and awards.[10]

Mr. Colgate and Mr. Vail reported these findings to the Attorney General. They explained to her that attorneys were working an average of five to nine additional hours per week, and that ordered, approved, or induced overtime should be compensated. They suggested legislation that would exempt Justice Department attorneys from overtime compensation. The Attorney General agreed and sent the proposal to the Office of Management and Budget. OMB objected to providing such an exemption, and no further action was taken.

The Department maintains two systems to track hours that attorneys work. One record shows that all attorneys work eight hours per day, forty hours per week. The other set includes detailed records of the hours that they actually worked. The latter time sheets are used for management and budgeting purposes, according to defendant, but they also are used to rank offices and to bill time for attorneys' fees and costs.

Authorized officials have no knowledge of individual hours worked because these records are seen only in compilation, defendant argues. The records track attorneys' efforts irrespective of whether their work was ordered or approved. They are not used for compensation. No one evaluated them to determine whether the time that was recorded was appropriate, or whether it was ordered or approved. These records apply only to certain divisions and offices, and they do not show what attorneys were doing, or why they were doing it after hours.

The records show substantial overtime among government attorneys, however, regardless of their intent or purpose. Justice Department officials at the highest levels knew of their existence and content. Attorneys in the Class have stated that overtime was an absolute requirement of their jobs and that management expected it. They understood that the records were used in their performance evaluations and for awards and promotions. Keeping track of their overtime in the second set of records was "a constant focus."[11] Plaintiffs consistently testified that they and their supervisors regarded the Manual's statement as an express directive to work overtime when necessary.

Attorneys handled their cases with professional judgment under deadlines that largely were self-imposed. Defendant argues that this element of their responsibilities precludes overtime for attorneys. Whether attorneys should qualify for overtime pay under the Federal Employees Pay Act is an issue that is not before us. Attorneys in this Class are subject to FEPA, and for whatever reason Congress has not exempted them from overtime compensation; nor have they been made subject to other premium pay systems such as AUO.[12]

Prior cases have considered the nature of an employee's work as a factor in determining inducement. *See, e.g., Adams v. United States,* 162 Ct.Cl. 766, 1963 WL 8610 (1963); *Byrnes v. United States,* 163 Ct.Cl. 167, 330 F.2d 986 (1963). In *Byrnes,* supervisors expected employees to exercise their professional judgment in deciding the amount of time necessary to complete their tasks. *Byrnes,* 163 Ct.Cl. 167 (1963). Defendant points out factual distinctions between our case and prior cases with regard to the nature of the work performed. In the cases

---

**10.** One United States Attorney had an innovative means of encouraging overtime that would appeal to officials in Washington:

Although AUSAs have improved reporting overtime hours on their ... report, we have decided to implement a fee structure for failing to address this important issue. AUSAs currently are averaging 60 hours of overtime a month. Any AUSA failing to meet this average will be expected to pay $1.00 per hour for every hour under 60 hours of overtime a month.

**11.** "[T]he front office published comparisons of the number of overtime hours worked in our district in comparison with the other districts in the country. The reporting of overtime was a constant focus of the front office. The front office communicated a policy of keeping the number of overtime hours at a high level ... I have been orally advised that increases in staff size relate to the reporting of overtime hours." [Memo to Staff from a U.S. Attorney.]

**12.** Administratively Uncontrollable Overtime. 5 U.S.C. § 5545(c)(2).

plaintiffs cite, employees were subject to duty and it was clear that they would have to perform overtime on a routine basis. "Most investigators, by the very nature of their responsibilities must work irregular hours and perform many hours of overtime duty." *Byrnes v. United States*, 163 Ct.Cl. 167, 171–172, 330 F.2d 986 (1963). Plaintiffs were IRS agents who were subject to call twenty-four hours a day. In this case, lawyers often have extra work, but perhaps only sporadically. Defendant notes that "DOJ's mission is not to provide around the clock legal services."

It is true that lawyers are not required to be at the office all the time, but they are required to complete their assignments however long they may take.[13] The Department expects its attorneys to exercise professional judgment, to complete assignments, and to meet deadlines. Lawyers generally are not subject to the same extended overtime on a daily basis as the officers in *Adams*, for example, or the agents in *Byrnes*, but at times they do work at the mercy of judges or opposing counsel. They are subject to exigencies that they cannot always control. The Department of Justice makes it clear that it expects attorneys to finish their job, and the attorneys know it.[14]

Defendant argues that this would be a "tacit expectation" if anything, and does not satisfy even the most liberal standards of "ordered or approved." Plaintiffs in *Albright*, 161 Ct.Cl. at 356, *Adams*, 162 Ct.Cl. 766, and *Hannon*, 29 Fed. Cl. 142, had more explicit directions to work overtime than the attorneys in this case, defendant stresses. However, the Department of Justice informed attorneys that it expected them to

work overtime when necessary. Authorized department officials testified that they understood the job to require overtime work. The Department's Manual states that attorneys should expect to work in excess of regular hours. These factors, along with management's understanding and approval of the process show that Department officials moved beyond "tacit expectation" into the area of "inducement." *See Byrnes v. United States*, 163 Ct.Cl. 167, 174, 330 F.2d 986 (1963) (expectation that employees would work overtime was not tacit, but "was made so explicit in terms as to amount to inducement and compulsion").

Defendant argues that the Manual does not establish inducement, but merely advises attorneys what they should expect.[15] The Manual states that "[a]ttorneys are professionals and should expect to work in excess of regular hours without overtime premium pay." Defendant suggests that this phrase was artfully drafted to distinguish it from overtime that will have been "officially approved." The phrase "work in excess of regular hours" is important in defendant's view, but we see it as more support for the conclusion that official policy at the Department of Justice has been to accept overtime work from its attorneys without paying for it.

Defendant complains that a judgment here would result in damages being paid retroactively to attorneys who did not ask for overtime pay when it was performed, and therefore did not give the Government the opportunity to make other arrangements. It is essentially an attempt by attorneys to raise their own salaries unilaterally, after the fact.[16] This is an appealing argu-

---

**13.** Statement in the Manual was "absolutely a directive by the Department to me . . ., that you will work more than forty hours because you're going to have to do your job correctly, we expect that of you, and you're not going to get paid." [Excerpt from an attorney's deposition.]

**14.** One attorney testified that the Manual told her what the Department "expected me to do" and that "I am required to work overtime," and that working overtime was a "requirement of the job." [Excerpt from an attorney's deposition.]

**15.** Defendant's brief states that the Manual "merely emphasizes what Assistant United States

Attorneys should anticipate that they as professionals will chose to do in performing their duties, not what the Department expects or orders."

**16.** An issue arose during oral arguments involving a hypothetical attorney who played on the computer during the day, took work home at night, then claimed overtime for it. This would be a proof of damages issue, not one of liability. Moreover, it would be a management concern for the Justice Department. Otherwise, attorneys who perform legitimate overtime would be denied benefits because managers failed to supervise their employees properly.

ment, but the fact remains that the work was done. The United States benefitted from overtime that was actually performed. Denial of benefits to which members of the Class are otherwise entitled would require the court to elevate form over substance. *See Anderson v. United States,* 136 Ct.Cl. 365, 394, 1956 WL 8341 (1956) (withholding written orders or approval "reflected observance of the letter of the regulation but denial of the substance of the statute").

The Justice Department Manual states, "United States Attorneys are NOT authorized to approve overtime premium pay for attorney personnel. Assistant United States Attorneys are professionals and should expect to work in excess of regular hours without overtime premium pay." The Government now argues that this section of the Manual advises prospective employees that they will not be paid overtime, and that this language prevents overtime from ever being "ordered or approved." This language from the Manual could mean that the Justice Department does not pay overtime, so attorneys should not work overtime; or that overtime is common and expected in this business but the Department does not pay overtime, so do not ask for it. In any event, agencies may not exempt themselves from the law by the simple expedient of issuing a policy stating that it will not pay overtime.

Defendant argues most persuasively that a system of paying litigating attorneys overtime would affect their professionalism adversely.

The Department wanted to promote professionalism because treating lawyers professionally, rather than as hourly workers, is consistent with the way attorneys see themselves. Ordering and approving overtime work would be inconsistent with and harmful to this professional atmosphere because ordering overtime requires direction concerning when, where, and for how long work is performed. That type of direction detracts from an attorney's autonomy, discretion, and control of his or her work product. It is this level of control possessed by individual attorneys which makes the Department so attractive to its highly qualified lawyers in the first place.

We agree entirely with this statement and commend it. For the purposes of this litigation, however, it is irrelevant. Attorneys in the Class are covered by the Federal Employees Pay Act and they are entitled to overtime if they meet its requirements.[17] Plaintiffs are in this court to vindicate their rights under that law. Though one may speculate on the effects of an award of back pay in this case, including possible changes in procedure, or its impact on professionalism in the Department, those issues are beyond the scope of this court's jurisdiction.

## V. SUMMARY JUDGMENT STANDARDS

Factual issues necessary for the court to make a ruling on liability are not in dispute. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Cross-motions for summary judgment are no more than claims by each party that it alone is entitled to summary judgment. This does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Intern., Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is un-

---

17. "It may be that Congress would have been well advised to omit such employees from [FEPA] or to make some different arrangement for their compensation. But Congress did not omit them, and their superiors were not authorized to deny to them the benefits of the Act on the ground that administration of the Act would be difficult ...." *Anderson v. United States,* 136 Ct.Cl. 365, 367, 1956 WL 8341 (1956).

der consideration. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001).

We have taken these standards into consideration and determined that trial is not needed to rule on liability. As noted elsewhere herein, trial on damages would be necessary if the parties cannot reach an agreement. "When [an employee] is acting outside his formally assigned hours, and is claiming pay for so acting, he has the burden of showing that what he does is worth doing, and is reasonably calculated to promote the end for which he is employed." *Anderson v. United States,* 136 Ct.Cl. 365, 367, 1956 WL 8341 (1956).

## VI. CONCLUSION

Overtime is an important management concern. The authority to "order or approve" overtime should be vested in officials who are reasonably available to employees who may be subject to it.[18] To resolve this case, the Department of Justice should agree to abide by the Federal Employees Pay Act; promulgate a procedure for attorneys to request overtime, in advance if possible; delegate clear lines of authority among officials who are reasonably accessible to employees who would request overtime; and create a fund to compensate attorneys for lost premium pay, to be distributed according to a formula crafted by the Class.

Plaintiffs' motion for summary judgment on liability is GRANTED. Defendant's cross motion is DENIED. Counsel will contact the court within thirty days to recommend further proceedings.

---

**18.** In *Adams v. United States,* 162 Ct.Cl. 766, 1963 WL 8610 (1963), the Attorney General directed that all overtime was to be ordered by the head of the division and approved in advance by an Assistant or Deputy Attorney General. The court found such a requirement to be unreasonable and invalid. Some of the work was emergency in nature and could not be anticipated by a "high official in Washington." The "need for overtime [was] so irregular but recurrent that it would normally be impossible or overly difficult to obtain advance approval from the Washington officials for each specific overtime period to be worked .…" *Adams,* 162 Ct.Cl. at 770.